IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BLANCA N. FIGUEROA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13-cv-03026 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| VILLAGE OF MELROSE PARK, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Blanca Figueroa claims that her former employer, the Village of Melrose Park ("Village"), and its Chief of Police, Sam Pitassi, refused to allow her to join the Village's police force because of her gender and race. Figueroa has sued the Village and Pitassi for this alleged discrimination and those defendants have now moved for summary judgment on all of the claims against them. (Dkt. No. 43.) For the reasons detailed below, the defendants' motion is denied.

**BACKGROUND**

Figueroa, who is a Hispanic woman, was employed by the Village from March 2011 until September 2011. (Pl.'s Resp. to Def.'s Rule 56.1 Stmt. of Uncontested Material Facts ("Pl.'s Rule 56.1 Resp.") ¶ 2, Dkt. No. 47.) Figueroa was originally hired as a probationary police officer. (*Id.* ¶ 4.) Then, on May 11, 2011, Figueroa and another police officer candidate, Aldo Scudiero, were enrolled by the Village in the training academy for the police department of the City of Chicago. (Pl.'s Rule 56.1(b)(3)(C) Stmt. of Additional Facts ("PSAF") Ex. P at 13-14, Dkt. No. 46-6.) The City of Chicago's academy trained recruits for suburban police departments on a contract basis. (PSAF Ex. N at 6-7, Dkt. No. 46-4.) Figueroa claims that she successfully

completed her basic training and, as a result, she was certified by the State of Illinois as a qualified law enforcement officer in August 2011. (PSAF ¶ 2, Dkt. No. 46.)

Despite what Figueroa describes as her successful completion of the academy basic training course, she was not given an assignment as a police officer. (*Id.* ¶¶ 2-4.) Moreover, she was asked to resign and ultimately terminated without ever receiving an assignment. (*Id.*) Figueroa claims that the Village's decision not to give her an assignment but instead to terminate her was motivated by prejudice against her gender and Hispanic heritage. She seeks relief from the Village and Pitassi for the alleged gender and race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). She also seeks relief from the Village and Pitassi for race discrimination under 42 U.S.C. § 1981.

## DISCUSSION

Summary judgment is appropriate when the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Davis v. Time Warner Cable of S.E. Wisc.,* 651 F.3d 664, 671 (7th Cir. 2011). At the summary judgment stage, a district court may not assess the credibility of witnesses, choose between competing inferences, or balance the relative weight of conflicting evidence. *Abdullahi v. City of Madison,* 423 F.3d 763, 769 (7th Cir. 2005). The court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *Id.*

Because the elements and methods of proof are the same regardless of whether a discrimination claim is brought under Title VII or § 1981, the summary judgment analysis is also the same for claims under both statutes. *McGowan v. Deere & Co.,* 581 F.3d 575, 579 (7th Cir. 2009). The "fundamental question" for discrimination claims under either statute "is simply

whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86,* 746 F.3d 835, 840 (7th Cir. 2014).

A plaintiff may establish the existence of evidence of discrimination sufficient to reach a jury by either "direct" or "indirect" methods. *Orton-Bell v. State of Indiana,* 759 F.3d 768, 773 (7th Cir. 2014). "Direct" proof includes both evidence explicitly linking an adverse employment action to an employer's discriminatory animus and circumstantial evidence that would permit a trier of fact to infer that discrimination motivated the adverse action. *Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 587 (7th Cir. 2011). In responding to a summary judgment motion, a plaintiff must identify the method of proof that supports an inference of discrimination in her case. *Morgan v. SVT, LLC,* 724 F.3d 990, 995 (7th Cir. 2013). Here, Figueroa contends that there is sufficient evidence of gender and racial discrimination under both methods.

## I. Direct Evidence of Discrimination

Under the direct proof approach, remarks and other evidence that reflect a propensity by the decision maker to evaluate employees based on illegal criteria will suffice as evidence of discrimination even if the evidence stops short of a virtual admission of illegality. *Whitfield v. Int'l Truck and Engine Corp.,* 755 F.3d 438, 443 (7th Cir. 2014) (quoting *Miller v. Borden, Inc.,* 168 F.3d 308, 312 (7th Cir. 1999); *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir. 1997)).

At her deposition, Figueroa testified that on multiple occasions over the course of her basic training at the Chicago police academy, Pitassi told her that she would be a liability to the Village police department and that she would not be hired as an officer. (PSAF Ex. L at 213-14, 223, 240, Dkt. No. 46-2.) On at least one such occasion, Pitassi told her that she would not be able to defend herself in a confrontation with a 200-pound man. (*Id.* at 225.) Figueroa's brother Anthony, a member of the Village's fire department, was present at one such meeting and

countered Pitassi's comments by pointing out that the City of Chicago had many female police officers. (*Id.* at 226.) Pitassi responded by stating that that the City of Chicago's much larger number of police officers would allow backup officers to arrive more quickly. (*Id.*)

Although Pitassi did not explicitly admit that his aversion to hiring Figueroa was because of her gender, his comments do suggest a presumption that she would be physically unable to perform as a police officer. Yet no evidence supports that presumption. In contrast, Figueroa has presented evidence that to enter the police academy she was required to pass a "power test" that included strength, stamina, and flexibility requirements. (PSAF Ex. L at 35, Dkt. No. 46-2; PSAF Ex. N. at 207, 233, Dkt. No. 46-4.) She also has presented evidence that, although she struggled to complete training runs during one period of her police academy course, she had no other physical difficulties at the academy and passed the tests—including physical tests—that were requirements for successful completion of the academy program. (PSAF Ex. L at 41-43, Dkt. No. 46-2; PSAF Ex. N at 207, 233, Dkt. No. 46-4.) Pitassi's speculation that Figueroa would be unable to defend herself against a man, in the absence of proof that she was unable to perform at the physical level required by the academy, supports an inference that his presumption was related to her gender.

Such presumptions are unlawful. "It is now well recognized that employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females. Myths and purely habitual assumptions about a woman's inability to perform certain kinds of work are no longer acceptable reasons for refusing to employ qualified individuals, or for paying them less." *City of Los Angeles, Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707 (1978). Thus, the Court concludes that Pitassi's comments provide sufficient direct evidence

to support an inference that his assessment of her employment prospects was motivated by gender discrimination.

The defendants contend that Pitassi's motives provide insufficient evidence to permit Figueroa to present her case to a jury because the ultimate decision to terminate her was made by the Village Board of Fire and Police Commissioners. But evidence of discrimination by an individual who provides input into the ultimate employment decision, when it occurs around the time of, and in reference to, the adverse employment action complained of, is sufficient to show that the decision was motivated by discriminatory intent. *Hunt v. City of Markham, Ill.,* 219 F.3d 649, 652-53 (7th Cir. 2000). In this case, it is undisputed that Pitassi recommended to the commissioners that Figueroa's employment be terminated. It is also undisputed that the commissioners followed his recommendation. (Defs.' Rule 56.1 Stmt. of Material Facts, ("DSOF") Exs. W, X, Dkt. No. 45-4.) Pitassi's discriminatory motive would thus be sufficient to support a determination that the commissioners' ultimate decision was improperly motivated.

The record does not contain similar direct evidence of race discrimination, however. Figueroa asserts that Pitassi, when suggesting that she resign, offered to place her in a job at a 911 call dispatch center and remarked that the center was looking for bilingual employees. (PSAF Ex. M at 69, Dkt. No. 46-3; PSAF Ex. L at 240, 260, 302, Dkt. No. 46-2.) Although the alleged remark and its context indicate that Pitassi was expressing an unwillingness to allow Figueroa to join the police force, the comment does not suggest that his unwillingness was related to his view of her bilingual abilities. Pitassi's remark thus fails to raise a direct inference of racially discriminatory motive.

## II. Indirect Evidence of Discrimination

A plaintiff may also survive summary judgment by raising a sufficient inference of discriminatory action through the "indirect" method of proof. Under this method, a plaintiff seeking to avoid summary judgment must establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment. *Lucas v. PyraMax Bank, FSB,* 539 F.3d 661, 666 (7th Cir. 2008). If she can make this showing, her employer then bears the burden of showing that it had a legitimate, nondiscriminatory reason for the adverse action of which she complains. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). If the employer makes this showing, the plaintiff still may prevail by presenting sufficient evidence to support a determination that the asserted legitimate reason was pretextual. *Id.*

The parties in the present case do not dispute that Figueroa is a member of a protected class or that she suffered an adverse employment action. The defendants instead argue that they terminated Figueroa because she was not meeting their job expectations. They also contend that her failure to meet expectations prevents her from establishing favorable treatment for a similarly situated employee, since Figueroa's only asserted comparator, fellow recruit Scudiero, did not suffer comparable failures.

The deficiencies in Figueroa's performance identified by the defendants all relate to her performance at the police academy. The City of Chicago's academy conducted training classes for police officer recruits of suburban municipalities and instructed those recruits on state law requirements for certification as law enforcement officers. (PSAF Ex. N at 6-10, Dkt. No. 46-4.) Under the academy's rules, any request for time off, or any performance failure, rules infraction,

or disciplinary incident by a recruit, mandated that the recruit write a memo to a superior officer detailing the occurrence and, if necessary, the steps the recruit would take to remedy the situation. (*Id.* at 18-20.) Any memo relating to a recruit was forwarded to the academy's contact person at the recruit's home police department. (*Id.* at 11.) Trak Silapaduriyang, the homeroom instructor for Figueroa's class of recruits, communicated with Pitassi about the Village's recruits. (*Id.*at 24-25.)

Figueroa's term at the academy produced numerous memos. Some apparently related to technical disciplinary matters. In one memo, Figueroa explained that she had attended class without her uniform hat and acknowledged that she was required to appear for class in full uniform and would do so in the future. (DSOF Ex. H, Dkt. No. 45-3.) When she chewed bubble gum and blew bubbles during a training exercise, one of her superior officers wrote a memo about the incident and she was directed to write a memo as well. (DSOF Exs. R, S, Dkt. No. 45-4.) When she changed out of uniform to participate in a plainclothes training exercise, she left her uniform shirt and badge hanging in a women's restroom; the officer who found the items wrote a memo and Figueroa was also required to provide a written explanation. (DSOF Exs. U,V, Dkt. No. 45-4.) Other memos related to Figueroa's performance in training. As noted above, she had difficulties completing training runs; she and her homeroom instructor, Silapaduriyang, both wrote memos documenting her inability to complete runs on July 8 and July 11, 2011. (DSOF Exs. J, K, L, Dkt. No. 45-3.) A firearms training instructor reported that, at a session on June 17, 2011, Figueroa "was unable to perform any of the hands on practical application of the pistol." (DSOF Ex. I, Dkt. No. 45-3.)

In July 2011, Steve Rogowski, a Village police department lieutenant, went to the academy to observe Figueroa and Scudiero. He wrote a memo to Pitassi documenting his visit.

7

(DSOF Ex. M, Dkt. No. 45-3.) Rogowski saw a training exercise in which Figueroa and Scudiero were partners in a scenario that required them to respond to a radio alert of a suspicious person and ultimately to approach and arrest suspects. (*Id.*) Rogowski observed that their response "was, overall and relative to other members of their class, above average." (*Id.*) But in discussing Figueroa specifically, he noted that when the suspect she was arresting yelled, "get your hands off me," she released his arm and took a defensive stance. Rogowski observed that academy staff advised Figueroa on how to correct her procedure in future exercises. (*Id.*)

Rogowski commented on Figueroa's apparent "relative lack of physical conditioning" and reported that he had heard from academy staff that she had been unable to complete training runs. (*Id.*) He also stated that he believed she needed to "compensate for her physical limitations" by "increasing her mental toughness" and "working harder than other recruits." Rogowski wrote, "[h]er willingness to [drop out] of runs and quit on her fellow recruits at the first signs of discomfort may be a signal that during a physical altercation with a criminal she may quit the fight too easily causing harm to the public, her fellow officers and most likely and importantly to herself." (*Id.*)

An August 12, 2011 memo from recruit training instructor Stanley Williams reported that, in a suspicious person training exercise, Figueroa, after controlling the suspect, returned to her car and failed to respond as the suspect went back to his car, received a gun, and approached her with it. (DSOF Ex. T, Dkt. No. 45-4.) Williams wrote that Figueroa appeared to be unconcerned with the outcome of the exercise, that she did not appear to be focused on the exercise, and that she had not appeared to absorb the vehicle stop training. (*Id.*)

The defendants argue that these and other similar incidents establish that Figueroa was not meeting their legitimate job expectations, and they cite as support for their arguments various

cases in which employees have been held to have been properly terminated because of repeated disciplinary actions, including actions occurring during training. But each of the cited cases analyzed facts distinguishable from those presented here. For example, in *Buntin v. City of Indianapolis,* 500 Fed. Appx. 524 (7th Cir. 2013), the plaintiff, a probationary police officer, received failing scores in a required training program, never completed the program, and admitted that she had fairly been given failing grades in "critical" areas upon which advancement was conditioned. *Id.* at 525-26. In *Sheppard v. Village of Glendale Heights,* No. 11-cv-1044, 2014 WL 1227025 (N.D. Ill. Mar. 25, 2014), the employer's summary judgment motion identified multiple disciplinary infractions that prevented any finding that the plaintiff was meeting its expectations; there, the plaintiff admitted the infractions and did not offer any evidence that she had performed adequately. *Id.* at *5. Finally, the plaintiff in *Garcia v. Illinois State Police*, 545 F. Supp. 2d 823 (C.D. Ill. 2008), was terminated from her attendance at the state's police academy after senior officers at the academy recommended her dismissal for "inability to follow directions, be forthright, or accept responsibility" and for "untruthfulness and insubordination." *Id.* at 829.

Unlike the cases cited by the defendants, Figueroa here has presented evidence that her missteps at the academy were considered correctable events that would not prevent successful completion of her training. For instance, Silapaduriyang was asked in his deposition about a training exercise in which Figueroa stood in an exposed position, called a "fatal funnel," and was shot while trying to unjam a malfunctioning gun. (PSAF Ex. N at 183-84, Dkt. No. 46-4.) He said, "it doesn't surprise me that the, you know, recruits will get shot because, again, that's training. You know, we're trying to teach them something, to make sure that if it is a fatal funnel, do not stand there; otherwise, you will get shot." (*Id.* at 184.) Silapaduriyang emphasized that a

9

recruit's mistakes in training were not predictors of bad performance as a police officer: "You have to understand, training – we want you to make mistakes in our training buildings. We don't want you to make that same mistake when you're out on the street." (*Id*. at 185.) He further explained, "That's how we train. It doesn't mean that this person is a bad officer or a bad recruit because he or she stands." (*Id.*at 186.) What is more, Silapaduriyang went on to elaborate, "You know, some people will get it the first training, the first time they do a scenario, some people don't. We may have to put them through a couple times." (*Id.* at 188.)

Asked about the firearms instructor's assessment that Figueroa had been unable to perform any of the practical applications of her pistol, Silapaduriyang responded, "[S]ome recruits do have problems with the firearms. And I'll be the first to tell you, when I came through I never touched a handgun before. The only thing is, as long as they follow instructions, do what the experts are telling them to do, and at the end if they pass the State qualification – State-mandated qualification, then you know that, you know, the firearm instructor did their job." (*Id.* at 126.) It is undisputed that upon completion of her academy training, Figueroa passed the state firearms test on her first attempt. (Defs.' Resp. to Pl.'s Stmt. of Additional Material Facts ("DAF") ¶ 5, Dkt. No. 52.)

Williams, the instructor who authored the memo describing Figueroa's failure to secure a suspect properly, failure to react as he approached her with a gun, and apparent lack of concern with her performance on the exercise, testified at his deposition that such failures were "common" even at the stage of training when the incident occurred, *i.e.*, approximately two weeks before the end of the academy term. (PSAF Ex. O at 56, Dkt. No. 46-5.) Williams said that scenario-based training was not assessed on a pass-fail basis or otherwise graded. (*Id.* at 26.) He further testified that when a recruit performed an exercise incorrectly, she would be retrained

and would go through the exercise again. (*Id.*) After the exercise that prompted Williams's memo about Figueroa, she was retrained on the proper approach to the scenario and performed the exercise correctly thereafter. (*Id.* at 52-54.) And the parties do not dispute that Figueroa completed her academy training, passed the tests required for certification as a law enforcement officer under Illinois law, and was certified as a qualified law enforcement officer by the state. (DAF ¶ 2, Dkt. No. 52.)

Figueroa has thus presented evidence sufficient to raise an inference that in the eyes of her instructors, she successfully completed her academy training. In response to this inference, the defendants contend that Figueroa was not an employee of the City of Chicago's police department or its police academy, that the Village was entitled to set its own standards regarding success for its recruits, that it could set higher performance standards than the academy, and that Figueroa's failure to meet those standards defeats her claim that she was meeting the expectations of her position. The defendants correctly observe that their application of higher standards need not be accurate, wise, or well-considered; rather, the application of those standards need only be the honest reason for the action taken. *Ptasznik v. St. Joseph Hosp.,* 464 F.3d 691, 696 (7th Cir. 2006).

But when asked at his deposition about the standards that Figueroa failed to meet, Pitassi identified the standards "that are set forth by the Chicago Police Academy." (PSAF Ex. P at 25, Dkt. No. 46-6.) Asked if the Village had specific physical performance tests, Pitassi further testified: "No, not after the academy, just should be in good physical condition." (*Id.* at 37.) Pitassi also acknowledged that the Village had no written standards for its police officers' physical performance, stating "[t]hat's what the academy is for." (*Id.* at 38.)

This evidence supports an inference that Pitassi shared the view of the academy training process expressed by the academy instructors themselves—that successful completion of the academy training course and certification by the state constituted sufficient performance to permit recruits to progress to the next stage in their employment progression, which was field training with the Village police department. A factfinder accepting this view of the evidence could therefore conclude that the Village's true expectation of recruits during their academy training was that they successfully complete the course of study and the certification process. Such a finding would support a determination that Figueroa was meeting the Village's legitimate expectations and that its claims to the contrary were a pretext for discrimination. Conversely, the evidence could also support an inference that Pitassi honestly believed that Figueroa's early performance difficulties were too serious to be cured, no matter how well she performed later. The conflicting inferences regarding whether Figueroa was meeting the Village's expectations create a disputed issue of material fact. *Tarochine v. Roberts Pipeline, Inc.,* No. 13-cv-1304, 2014 WL 6786268, at *6-7 (N.D. Ill. Dec. 3, 2014); *Pu v. Columbia Coll. Chicago,* 934 F. Supp. 2d 964, 971-72 (N.D. Ill. 2013).

The conflicting evidence of the defendants' legitimate expectations of Figueroa creates a factual dispute as to whether her fellow recruit Scudiero is a similarly situated comparator for purposes of showing discrimination through the indirect method of proof. The parties do not dispute that Scudiero is a white male and that, upon completion of his academy training and state certification at the same time as Figueroa, he received an assignment with the Village police department while she was terminated. (DAF ¶¶ 2, 4, Dkt. No. 52.) If successful completion of the academy training and state certification process are the only honestly-held Village measures for inclusion on its police force, Figueroa and Scudiero are similarly situated. Scudiero, as a

white male, received better treatment, and a jury could find that the defendants' reliance on Figueroa's academy performance as the reason for her termination is pretextual. On the other hand, as noted above, if a factfinder accepted academy performance as the defendants' good-faith basis for differentiating between recruits, a jury could find that Figueroa and Scudiero were not similarly situated. Whether a comparator is similarly situated is usually a question for the factfinder, and summary judgment is generally appropriate only when no reasonable factfinder could find that the plaintiff has met her burden on the issue. *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009). The issue is properly reserved for the jury here.

## CONCLUSION

For the reasons detailed above, Figueroa has presented sufficient evidence of gender discrimination under both the direct and indirect methods of proof to establish disputed issues of material fact on her claims. She has also presented sufficient evidence of race discrimination under the indirect method of proof to show disputed issues of material fact. The defendants' motion for summary judgment is therefore denied.

ENTERED:

Dated: August 31, 2015

_____
Andrea R. Wood
United States District Judge